UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAPE IBRAHIMA DIAGNE,

      Petitioner,

v.                                     Case No. 2:18-cv-11793
                                     Honorable Victoria A. Roberts

SARAH HAMIDA DEMARTINO,

      Respondent.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR RETURN OF CHILDREN UNDER THE HAGUE CONVENTION [ECF No. 1]

### I.      INTRODUCTION

Petitioner Pape Ibrahima Diagne (the "Father") filed a Verified Petition for Return of Children to Canada against Respondent, Sarah Hamida DeMartino (the "Mother") on June 5, 2018 pursuant to The Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act ("ICARA"). The Father seeks return of his two children, six-year-old N.M.D. and seven-month-old I.N.D., to Canada. The children reside in Michigan with the Mother.

The Court held an evidentiary hearing on July 24-25 and September 11, 2018.

### II.      FINDINGS OF FACT

#### A.  Feb. 27, 2010 – Aug. 16, 2017: Events before the 2017 family vacation to the United States.

1.      The parties were married on February 27, 2010 in Quebec, Canada. They have two sons born during the marriage.

2.      The Father is a Canadian citizen and was not entitled to live or work in the United States at any time relevant to this action.

3.      The Father sponsored the Mother, a United States citizen, to become a Canadian permanent resident after the marriage.  In late 2016, the parties applied to renew the Mother's permanent resident status in Canada.  The renewal was granted for an additional five years.

4.      The parties established their family life together and set up their first home in Canada.

5.      The parties' first son, N.M.D., was born in Quebec on May 29, 2012.

6.      By birth, N.M.D. is both a citizen of Canada and the United States.

7.      In December 2014, the parties leased a home in London, Ontario, Canada jointly. They moved there with N.M.D. to allow the Mother to be closer to her family in Michigan.

8.      In July 2016, the parties purchased a home in London, Ontario.

9.      N.M.D. attended day care in London, Ontario and junior kindergarten at École Frère André in London in the 2016-2017 school year. The Mother and Father enrolled N.M.D. at the same school for the 2017-2018 school year for kindergarten. He was also enrolled for the 2018-2019 school year.

10.     N.M.D.'s family doctors were all in London, Ontario.

11.     In March 2017, the Mother became pregnant with I.N.D., the parties' second child.

12.     The new baby was due to be born in December 2017.

13.     The Mother planned on using a Canadian midwife.  The parties planned on either a home birth or that the new baby would be born at the local hospital in London, Ontario.

14.     In August 2017, when the Mother was approximately five months pregnant, the parties traveled to Rhode Island for their family vacation.

15.     The family took this same vacation every summer since their marriage to visit the Mother's parents.

16.     The parties usually travelled by car to Rhode Island for this annual trip, and they always returned home to Canada at the end of the trip.

17.     In 2016, the Mother and N.M.D. flew to Rhode Island one week ahead of the Father, and the family drove back to Canada together at the conclusion of the vacation.

18.     The 2017 summer vacation was scheduled for August 12 to August 20, 2017.

19.     The parties originally planned to return to Canada together – as usual – at the end of the 2017 vacation.

20.     On August 12, 2017, the parties and N.M.D. drove to Rhode Island.

21.     On August 16th, the Mother discovered e-mails between the Father and one of his female co-workers, suggesting the Father was having an affair with his co-worker.

22.     The Mother confronted the Father about the e-mails and his involvement with the coworker.

23.     The Father left the vacation on August 16, 2017 – ahead of schedule – after giving the Mother N.M.D.'s passport so he could return to Canada.

**B. Aug. 17, 2017 – Dec. 10, 2017: The parties' separation.**

24.     The Mother and N.M.D. did not return to Canada at the end of the Rhode Island vacation.  Instead, on August 20, the Mother flew to Fort Worth, Texas with N.M.D.

25.     Before the Rhode Island trip, the Mother and Father never discussed that N.M.D. would relocate to the United States with the Mother.

26.     The Mother and Father spoke by telephone after the Mother and N.M.D. arrived in Texas.

27.     In their telephone call, the Father began efforts to persuade the Mother to voluntarily return home to Canada with N.M.D. The Mother told the Father that they needed to spend time apart to work on marital issues.  The Mother said she needed to cool off, and spend time with and get support from her family.

28.     The Mother has family in the Fenton area in Michigan – a two-and-a-half-hour drive from the parties' family home in Ontario.

29.     After spending ten days in Texas, the Mother and N.M.D. arrived in Michigan on August 29 or 30, 2017 and stayed in a home owned by the Mother's sister and brother-in-law.

30.     The Mother and Father remained in contact by telephone after the Mother and N.M.D. arrived in Michigan.

31.     The Mother refused to commit to a date certain on which she would return home to Canada with N.M.D.

32.     In efforts to persuade the Mother to come home to Canada with N.M.D., the Father drove to Michigan to visit the Mother and N.M.D in early September.

33.     The Father made several trips to Michigan.

34.     Each time, the Mother refused to return home with the Father and refused to send N.M.D. home to Canada with the Father.

35.     Instead, the Mother insisted that the Mother and Father work on their marriage, with the Father staying in Canada and the Mother and N.M.D. staying in Michigan.

36.     The Mother also insisted that the parties engage the assistance of a religious leader in the Mother's family's community in Michigan to work with them.

37.     The Father continued to drive back and forth between Canada and Michigan.

38.     On September 1, 2017, the Father sent an email to the Mother, saying: "I'm slowly coming to an agreement with your logic … [i]t looks like what's best for us is to leave everything behind in Canada and move to the States, I have started looking into things. I emailed Nathan to find out the total penalties for breaking the mortgage. I'm also looking for a cheap car in the meantime. I am looking into apartments close to work . . . I've texted a landlord to arrange a visit. I hope they have short-term leases. I need you to start a petition for a green card: https://www.us-immigration.com/I-130-immigrant-petition-green-card.html . . . [p]lease start this process now so that, hopefully, by the time I get a job there things will be done. Thank you."

39.     Before one of the Father's visits to Michigan, the Mother requested that the Father bring N.M.D.'s birth certificate and immunization records so that the Mother could enroll N.M.D. in school in Michigan.

40.     Although the Father had not agreed that N.M.D. could live in Michigan, he accepted that the child could not miss school pending the return of N.M.D. to Canada.

41.     On September 9, 2017, the Father brought papers to enroll N.M.D. in school in the United States.

42.     The Father also brought miscellaneous toys from the parties' house in Canada for N.M.D., along with N.M.D.'s birth certificate and immunization records.

43.     In mid-September, the Father texted the Mother, "I trust that you will take care of our children," and to "[m]ake a new life for yourself [in Michigan.]"

44.     On September 13, 2017, with the Father's knowledge, the Mother went to the parties' home in Canada and retrieved her personal belongings. The Father helped the Mother pack and load her car with furnishings and items personal to her and N.M.D.

45.     The Mother says this evidences his acquiescence in the family relocating to Michigan. Contemporaneously with this activity, the Mother accused the Father in emails of "flip-flopping."

46.     On that same day, the Mother expressed interest in reconciling: "I thought maybe we would reconcile," and "if we get back together the assets will be put back together."

47.     While in Canada, the Mother retained a Canadian attorney.

48.     By September 15, 2017 the parties had agreed to split their belongings from their mutual home; the Father agreed to bring the Mother's and N.M.D.'s belongings to her in the United States.

49.     On September 16, 2017, the Father delivered these belongings to the Mother in the United States.

50.     At a late September dinner with his friend, Mohammed Quli, the Father said that he and the Mother were moving to Michigan.

51.     On September 14, 2017, the Mother's attorney sent the Father a proposed Interim Separation Agreement (the "Interim Agreement").

52.     A cover letter to the Interim Agreement stated that the purpose of the Interim Agreement was "to deal with immediate matters to include interim arrangements regarding custody, parenting time, child support and spousal support."

53.     The Interim Agreement provided that the Father would consent to the Mother "relocating her residence, along with [both N.M.D. and I.N.D.] to Michigan in order to receive the ongoing support from [the Mother's] family."

54.     The Interim Agreement was to end "on the earliest of the following: (a) the date that the parties enter into a final separation agreement or minutes of settlement or further order of

the court; (b) upon [the Mother] or [the Father] providing thirty days' written notice." Section 7.1 Interim Agreement.

55.      The Interim Agreement was to be "without prejudice to any rights of the parties." Section 7.2 Interim Agreement.

56.      The Interim Agreement was to become effective on the "date on which [the Father] signs it." Section 7.6 Interim Agreement.

57.      On September 26, 2017, the Father sent the Mother an email with minor revisions to the proposed Interim Agreement.  None of the revisions concerned the custody or parenting rights regarding N.M.D. and the unborn child.

58.      On that same day, in response to the email, the Mother asked the Father if he could sign the Interim Agreement and send it to her, and also drop it off at the Mother's attorney's office.  The Father answered, "Not today. . . I'm biking."  At the evidentiary hearing – on September 11, 2018 – the Father testified that he was "stalling" because he did not want to sign the Interim Agreement.

59.      On October 5, 2017, the Father again sent the Mother an email with minor revisions to the proposed Interim Agreement.

60.      That same day, the Mother agreed to the Father's revisions and told the father, "[You] can print [it]," to which the Father responded, "Will do."

61.      The cover letter to the Interim Agreement also stated: "The terms set out in the Interim Agreement are all subject to change in the final agreement which will be negotiated following the exchange of financial disclosure between the parties. Indeed, the final Separation Agreement can only be drafted/negotiated on the basis of this financial disclosure from one party to the other."

62.     The parties never exchanged financial information or income tax returns.

63.     The Father never signed the Interim Agreement.

64.     On October 16, 2017, in response to the Mother's questions about why the Father continued to delay signing the agreement, the Father sent the Mother multiple text messages, saying: "Rushing into this agreement can cause what is still in our control to be in others (sic) control… I don't want to put our lives and futures in the control of lawyers and judges," and "[l]et's take time to talk things out and figure them out."

65.     On November 20, 2017, the Father sent text messages to the Mother, saying: "You don't have my consent to stay away with my child," and "I don't want you having the baby there[.]"

66.     The same day, the Mother responded: "You already showed consent[.] You can't change now[.]"

67.     On November 30, 2017, the Father sent a text message to the Mother, saying: "We live in Canada. Our home is in Canada. I was fine with you taking some time apart. I hoped you would get better with support from your family. I voluntarily sent you money not only to support you but also my son. I made sure you were comfortable [in Michigan] by bringing you nice furniture."

68.     Throughout October and November 2017, as the Mother's December due date for the parties' younger child approached, the Mother continued to refuse to return to Canada with N.M.D.

69.     The Father never agreed that their youngest son would be born outside of Canada.

**C. Dec. 11, 2017 – June 5, 2018: I.N.D.'s birth and the Hague Petition.**

70.     The Mother gave birth to I.N.D. in Michigan on December 11, 2017.

71.     The Mother did not tell the Father she was in labor.

72.     The Father did not learn that I.N.D. had been born until a few hours after the child's birth when the Mother called the Father to tell him that I.N.D. had been born.

73.     The Father immediately drove from the family's home in Canada to the hospital in Michigan to be with his wife and sons.

74.     The Mother's mother, Safiyah Ann Englebrook, was also present at the hospital.

75.     After several hours at the hospital, the Father went to the Michigan house to care for N.M.D., put him to bed, and send him to school the next day.

76.     The Mother's mother stayed with the Mother and I.N.D. at the hospital. The next day, the Father picked up the Mother and I.N.D. from the hospital and drove them to the house where the Mother was staying in Michigan.

77.     The Father returned to Canada while the Mother's mother stayed with the Mother and children at the house in Michigan.

78.     On March 20, 2018, the Mother sent the Father multiple text messages, saying: "Now I want to be a family . . . [w]aiting til (sic) my heart is ready . . . [g]iving time and space so the problem dies down. The family cools down from the hurt[.]"

79.     On March 31, 2018, the Mother filed a Complaint for Divorce against the Father in the Family Division for the 44th Judicial Circuit of the State of Michigan.

80.     The Father was served with divorce papers on April 26, 2018.

81.     On June 5, 2018, the Father submitted a Verified Petition for Return of Children seeking the return of both children to Canada.

## III. APPLICABLE LAW

### A. THE HAGUE CONVENTION

Petitioner's case arises out of the Convention on the Civil Aspects of International Child Abduction. *See* Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 (entered into force Dec. 1, 1983) (the "Hague Convention" or "Convention").

The Convention seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of the Contracting State are effectively respected in the other Contracting States." Convention Art. 1. The United States and Canada are Contracting States.

"The Convention is meant to prevent a child from being 'taken out of the family and social environment in which its life has developed' and to 'deter parents from crossing borders in search of more favorable forums.'" *Ahmed v. Ahmed*, 867 F.3d 682, 687 (6th Cir. 2017) (quoting *Robert v. Tesson*, 507 F.3d 981, 991-92 (6th Cir. 2007), and *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II* ")).

To "establish procedures for the implementation of the Convention in the United States," Congress enacted the International Child Abduction Remedies Act ("ICARA"). 22 U.S.C. § 9001(b)(1). ICARA provides guidance "in addition to and not in lieu of the provisions of the Convention." § 9001(b)(3).

Under the Hague Convention and ICARA, a petitioner seeking the return of a child must show by a preponderance of the evidence "that the child has been wrongfully removed or retained" from the child's habitual residence. 22 U.S.C. § 9003(e); Convention Art. 3. A removal or retention is wrongful where: (1) it is in breach of the petitioner's custody rights "under the law

of the State in which the child was [a] habitual[] resident immediately before the removal or retention"; and (2) "at the time of removal or retention those rights were actually exercised . . . or would have been so exercised but for the removal or retention."  Convention Art. 3.

A Hague Convention case is not a child custody case.  Convention Art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").  Section 9001(b)(4) reads, in part: "The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."  22 U.S.C. § 9001(b)(4).

### B.  PETITIONER HAS BURDEN TO PROVE WRONGFUL REMOVAL OR RETENTION

A petitioner seeking return of a child under the Hague Convention must show by a preponderance of the evidence:

1) The child's habitual residence is the State where the child is to be returned;

2) Petitioner has custody rights of the child in that State; and

3) Petitioner actually exercised those rights at the time of wrongful removal or retention.

### C.  HABITUAL RESIDENCE

The Convention does not tell courts how to determine a child's habitual residence. Indeed, the Hague Conference regards habitual residence "as a question of pure fact, differing in that respect from domicile." Elisa Perez-Vera, *Explanatory Report on the 1980 Hague Child Abduction Convention* (1982) at 66; *see also Robert*, 507 F.3d at 988 (explaining that "habitual residence should not be determined through the 'technical' rules governing legal residence or common law domicile.").

Courts use two distinct standards to determine the habitual residence of a child under the Hague Convention: "acclimatization" and "shared parental intent." *Ahmed*, 867 F.3d at 687-90; *Robert*, 507 F.3d at 994.

The Sixth Circuit typically uses the acclimatization standard "because it serves one of the main purposes of the Hague Convention: ensuring a child is not kept from her family and social environment." *Ahmed*, 867 F.3d at 688. However, for cases involving infants and "especially young children," the shared parental intent standard is more suitable. *Id.* at 690.

### i. THE ACCLIMATIZATION STANDARD

The Sixth Circuit applies the acclimatization standard to all children "above the age of cognizance." *Moreno v. Zank*, 895 F.3d 917, 923 (6th Cir. 2018). For children above the age of cognizance, "habitual residence [means] the nation where, at the time of [the] removal [or retention], the child has been present long enough to allow 'acclimatization,' and where this presence has a 'degree of settled purpose from the child's perspective.'" *Id.* (quoting *Robert*, 507 F.3d at 993 (secondary citation omitted)).

The Sixth Circuit "regard[s] 'meaningful connections with the people and places' in a country, including 'academic activities,' 'social engagements,' and 'sports programs,' as evidence of acclimatization." *Ahmed*, 867 F.3d at 689 (quoting *Robert*, 507 F.3d at 996). "[A] child's habitual residence is not determined by the nationality of the child's primary care-giver. Only 'a change in geography and the passage of time' may combine to establish a new habitual residence." *Robert*, 507 F.3d at 989 (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1401-02 (6th Cir. 1993) ("*Friedrich I*")).

Importantly, "because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual

residence." *Robert*, 507 F.3d at 989. Under the acclimatization standard, the Court's inquiry must "focus exclusively on the child's 'past experience.' 'Any future plans' that the parents may have 'are irrelevant to [the] inquiry.' *Id.* (quoting *Friedrich I*, 983 F.2d at 1401 (under the acclimatization standard, "the court must focus on the child, not the parents, and examine past experience, not future intentions")).

No "bright-line rule" exists to help the Court determine whether a child is old enough to use the acclimatization standard or whether use of that standard would be impracticable; the habitual residence determination is an intrinsically "fact-specific inquiry that should be made on a case-by-case basis." *Ahmed*, 867 F.3d at 690 (quoting *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001)).

### ii. THE SHARED PARENTAL INTENT STANDARD

In *Ahmed*, the Sixth Circuit formally adopted the settled mutual intent approach for Convention cases involving infants and young children:

> [I]t is appropriate to consider the shared parental intent of the parties in cases involving especially young children who lack the cognizance to acclimate to any residence. This is not a bright-line rule, and the determination of when the acclimatization standard is impracticable must largely be made by the lower courts, which are best positioned to discern the unique facts and circumstances of each case.

*Ahmed*, 867 F.3d at 690 (citations omitted). The *Ahmed* court went on to hold that, "what matters is where the [parents] intended the children to live." *Id.* But courts are generally in agreement that infants cannot acquire a habitual residence separate and apart from their parents.

"Where a matrimonial home exists, i.e., where both parents share a settled intent to reside, determining the habitual residence of an infant presents no particular problem[.] [I]t simply calls for application of the analysis under the Convention with which courts [are] familiar." *Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003). However, where the parents'

relationship has broken down – as is the case here – the character of the problem changes. The mere fact that conflict has developed does not automatically disestablish a child's habitual residence once it has come into existence. *Id.* "But where the conflict is contemporaneous with the birth of the child, no habitual residence may ever come into existence." *Id.*

In *Delvoye*, the mother was a U.S. citizen; the father was a citizen of Belgium. 329 F.3d at 332. Their romance developed in the United States and mother became pregnant. *Id.* The couple decided the cost of delivery in the United States was too expensive, and the mother acquired a limited visa to travel to Belgium for delivery of the baby. *Id.* The baby arrived in May 2001; by then, the couples' relationship had begun to deteriorate. *Id.* The father agreed that mother could return to New York with the child when the infant was two months old. *Id.* They continued to try to salvage the relationship, to no avail. *Id.*

The father filed a petition under the Convention for the return of the child to Belgium. The district court denied the petition, and the Third Circuit affirmed on appeal. *Delvoye*, 329 F.3d at 332. The court reasoned that when the parties' intentions are in agreement regarding their location, the infant's habitual residence is fixed as their own. *Id.* at 333. The court also held that a determination of whether any particular place satisfies the habitual residence standard must focus on the child, and consists of an analysis of the child's circumstances in that place, and the parents' shared intention regarding their child's presence in that place. *Id.*

Importantly, the court in *Delvoye* found that "'Where a child is born while his . . . mother is temporarily present in a country other than that of her habitual residence[,] . . . the child will normally have no habitual residence until living in a country on a footing of some stability.'" *Delvoye*, 329 F.3d at 334 (citation omitted; first ellipses in *Delvoye*).

In *Ahmed*, the Sixth Circuit upheld a finding that the father failed to satisfy his burden to prove that the parents shared an intention that their child would live in the United Kingdom – when the last time they agreed on a place to live was before the relationship became conflicted and before the mother conceived. 867 F.3d at 690-91. To the contrary, the evidence proved the couple's plans never converged from the time of conception until the mother retained the twin children. *Id.* With its holding, the Sixth Circuit joined the majority of circuits in prioritizing shared parental intent in cases concerning especially young children. *Id.* at 690.

### D. DEFENSES TO RETURN

If the petitioner carries his or her burden of proof to compel return of a child under the Hague Convention, the respondent may assert affirmative defenses to return. Applicable to this case are the defenses of consent and acquiescence under Article 13(a) of the Convention.

### i. CONSENT

A court is not bound to order the return of a child if the respondent can show by a preponderance of the evidence that the petitioner consented to the removal of the child. Convention Art. 13(a); ICARA § 9002(e)(2).

The defense of consent is concerned with a petitioner's actions before the removal or retention of a child from that child's habitual residence. *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005). Unlike acquiescence, which is discussed below, a petitioner's informal statements or conduct can manifest consent. *Id.* ("Consent need not be expressed with the same degree of formality as acquiescence."). "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Id.*

### ii. ACQUIESCENCE

A court is also not bound to order the return of a child if the respondent can show by a preponderance of the evidence that the petitioner subsequently acquiesced to the retention of the child. Convention Art. 13(a); ICARA § 9002(e)(2). The defense of acquiescence is primarily concerned with "whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter*, 423 F.3d at 371.

In the Sixth Circuit's seminal case addressing the issue of a child's habitual residence under the Hague Convention, the Court made clear that a finding of "[s]ubsequent acquiescence requires more than an isolated statement to a third-party. Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Friedrich II*, 78 F.3d at 1070. *See also Wanninger v. Wanninger*, 850 F. Supp. 78, 81-82 (D. Mass. 1994) (holding that father's personal letters to wife and priest were insufficient to show acquiescence where father consistently attempted to keep in contact with child).

Rather, "acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II*, 78 F.3d at 1070.

## IV. CONCLUSIONS OF LAW

### A. N.M.D. – THE FATHER'S PRIMA FACIE CASE

82.     The Father alleges that N.M.D. was wrongfully retained in the United States from Canada beginning August 21, 2017.  The parties agree on the relevant date.

83.     To prevail, the Father must establish his prima facie case by showing: (i) N.M.D.'s habitual residence immediately before August 21, 2017 was Canada; (ii) the Father has

custody rights to N.M.D. in Canada; and (iii) the Father actually exercised those rights at the time of retention.

84.     The Mother concedes, and the Court finds, that the Father carried his burden; he proves a prima facie case for the return of N.M.D. to Canada based on the Mother's wrongful retention of N.M.D. on August 21, 2017.

85.     The burden now shifts to the Mother to establish a defense to N.M.D.'s return.

## B. N.M.D. – THE MOTHER'S DEFENSES TO RETURN

### i. ACQUIESCENCE REGARDING N.M.D.

86.     The Mother says the Father acquiesced to N.M.D.'s retention in the United States.

87.     To succeed on this claim, the Mother must show that the Father acquiesced by "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II*, 78 F.3d at 1070.

#### 1. The Interim Separation Agreement

88.     The Interim Agreement (defined above) provides some evidence that the Father contemplated acquiescence to N.M.D.'s retention in the United States.

89.     The Interim Agreement provided that N.M.D. would live, at least temporarily, with the Mother in Michigan.

90.     The parties disagree as to whether the Interim Agreement was binding, but even if it were, the Father retained the right to rescind his agreement with "thirty days' written notice," and the Interim Agreement was "without prejudice to any rights or claims of the parties."

91.     Even if the Father was temporarily bound to this agreement by his manifestation of assent in emails to the Mother, it would not amount to a "convincing renunciation" of the rights that the Father had to request his children be returned from the United States.

92.     By the express terms of the Interim Agreement, it was meant only to deal with "immediate matters to include custody, parenting time, and financial support."

93.     The Father testified that he did not mean to assent to N.M.D.'s permanent retention in the United States by such terms.

94.     The written assent to this Interim Agreement in September and October 2017 occurred contemporaneously with the Father's text messages expressing his misgivings about the children moving to the United States.

95.     The Father's hesitation to sign the final agreement in the weeks after the parties drafted it further evidences the Father's lack of a "convincing renunciation."

96.     The Interim Agreement says it becomes effective on the date the parties sign it.

97.     The parties never signed the Interim Agreement.

98.     To hold that the Father acquiesced to N.M.D.'s retention by his brief assent to this Interim Agreement by email, would require the Court to improperly scrutinize "[e]ach of the words and actions of a parent … for a possible waiver of custody rights." *See Friedrich II*, 78 F.3d at 1070.

99.     Whether binding or not, the Interim Agreement by itself does not carry the "requisite formality" contemplated by the Court in *Friedrich II* to support a finding of acquiescence by the Father.  The Mother concedes as much; she, instead, argues that the totality of the circumstances – including the Interim Agreement – demonstrates acquiescence.

## 2. The Father's 9/1/17 "Green Card" Email

100.     This email from the Father said, "It looks like what's best for us is to leave everything behind in Canada and move to the States." It provides evidence that the Father contemplated acquiescing to N.M.D.'s retention in the United States.

101.     The Father's request for the Mother to look into getting a Green Card so that he could live and work in the United States shows that the Father considered moving to the United States. However, it does not amount to a "convincing renunciation" with the "requisite formality" required for a showing of acquiescence.

102.     The Father testified that he was "exploring options" when he sent this email to the Mother.

103.     The Father's ambivalence about whether to move to the United States is evidenced by his text messages in November 2017 saying that the family's home is in Canada.

104.     The Father's email from September 1, 2017 evidences the "fluid" intent of the parties often associated with a marital separation; to hold that the Father acquiesced to N.M.D.'s retention by this email would require the Court to improperly scrutinize "[e]ach of the words and actions of a parent … for a possible waiver of custody rights." *See Friedrich II*, 78 F.3d at 1070.

## 3. Consistent Attitude of Acquiescence

105.     The Mother says the totality of the circumstances demonstrates a consistent attitude of acquiescence. The evidence she relies on to show the Father's acquiescence includes: (1) the Father bought the Mother and N.M.D. tickets to fly to Michigan instead of Canada; (2) the Interim Agreement; (3) the Father's Green Card email from September 1; (4) on a trip to Michigan, the Father brought N.M.D.'s records for school enrollment; (5) the Father brought N.M.D.'s belongings to Michigan; (6) his September 25, 2017 text messages telling the Mother

to "make [a] new life for yourself there" and that he trusts she will take care of their children; and (7) his statement in late September to his friend, Mohammed Quli, that he and the Mother were moving to Michigan.

106.    Evidence that undercuts a finding of acquiescence includes: (1) the Father's September 2, 2017 text messages asking the Mother to come home and saying that he will "make it up to [her]"; (2) the Mother's September 13, 2017 messages expressing an interest in reconciling; (3) the Father never signed the Interim Agreement and hesitated to adopt it; (4) a September 25, 2017 text conversation between the parties where the Mother said that she only left "for time to heal" and that she wanted to "move back together once you move to somewhere else";  (5) the Father's November 30, 2017 text messages saying the family home is in Canada and he wants the Mother and N.M.D. to come home; (6) the Father's text messages that same day that he does not want I.N.D. to be born in Michigan, that he does not consent to the Mother keeping N.M.D. in Michigan any longer, and asking the Mother to please bring his child home; and (7) the Father's text message that he did not want to rush into the Interim Agreement and wanted to figure things out.

107.    While the Father may have shown a willingness to acquiesce for brief moments, he did not do so with the consistency required by the Sixth Circuit's understanding of acquiescence.  *See Friedrich II*, 78 F.3d at 1070 ("Subsequent acquiescence requires more than an isolated statement to a third-party. Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights.").

108.    Moreover, the Interim Agreement and the Father's email from September 1 lack the formality required by the Sixth Circuit precedent to constitute "a convincing written renunciation of rights."  *See id.* ("acquiescence under the Convention requires either: an act or

statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time."). *See also Currier v. Currier*, 845 F. Supp. 916, 922 (D.N.H. 1994) (a hastily-drafted written agreement was found insufficient to demonstrate acquiescence or consent).

109.     This Court finds no consistent attitude of acquiescence over a significant period of time on the part of the Father.

### ii.  CONSENT REGARDING N.M.D.

110.     The Mother says the Father consented to N.M.D.'s retention in the United States.

111.     As evidence of consent, the Mother cites the following: (1) the Father took the family car and abandoned her and N.M.D. in Rhode Island before the vacation was done, even though the Mother was pregnant and unable to fly alone; (2) the Father gave her money before leaving Rhode Island; and (3) the Father refused to return to the vacation home despite the Mother's request that he do so.

112.     Although the consent defense requires a focus on the petitioner's conduct before the removal or retention, a petitioner's conduct after removal or retention can further inform whether he or she consented before the retention. *Padilla v. Troxell*, 850 F.3d 168, 176 (4th Cir. 2017).

113.     The evidence relied upon by the Mother to show consent is weak. The parties agreed they would travel to Rhode Island for vacation purposes only, and then return home. Evidence supports that the Father agreed to the Mother staying in Michigan with family for a *limited* time – while the parties worked on reconciliation. The evidence relied upon by the Mother does not show the Father agreed that the Mother could retain N.M.D. in Michigan.

114.     Moreover, when viewing the evidence relied on by the Mother to show consent, along with the evidence which demonstrates there was no consistent attitude of acquiescence over a significant period of time, it is clear that the Mother fails to show by a preponderance of the evidence that the Father consented to the retention of N.M.D. in the United States.  *See*, *supra*, ¶ 107.

115.     The Mother fails to prove the defense of consent.

### C.  N.M.D. – CONCLUSION

116.     The Father proved his prima facie case that the Mother wrongfully retained N.M.D. from his home in Canada.

117.     The Mother failed to establish defenses to return, either acquiescence or consent.

118.     This Court finds that N.M.D. must be returned to Canada in accordance with the Hague Convention.

### D.  I.N.D. –FATHER'S PRIMA FACIE CASE

119.     Typically, wrongful removal cases are characterized by a parent unilaterally taking a child from his or her habitual residence without knowledge or permission of the other parent.  Determining the operative date in wrongful retention cases is more complicated.  That complication is presented here, where: (1) the pregnant Mother was in the United States with the consent of Father on August 20, 2017; (2) the relationship broke down around that time; (3) the parties engaged in numerous efforts to agree upon where the Mother would be with N.M.D and the child yet to be born; and (4) the Mother did not deliver I.N.D. until December 11, 2017.

120.     In the case of a wrongful retention, the time begins to run either (1) from the date the child remains with the abducting parent despite the clearly communicated desire of the left-behind parent to have the child returned, *Karkkainen v. Kovalchuk*, 445 F.3d 280, 290 (3d Cir.

2006); or (2) when the acts of the abducting parent are so unequivocal that the left-behind parent knows or should know, that the child will not be returned, *see Miller v. Miller*, No. 18-CV-86, 2018 WL 4008779, at *13 (E.D. Tenn. Aug. 22, 2018) (collecting cases).

121.     Following this logic, the date the Court could use for the retention of I.N.D. is certainly his birthday – December 11, 2017.  By then it was clear that the Mother was not returning to Canada to give birth to I.N.D.  However, the Court could use a later date, sometime between March 20, 2018 – when the Mother said in multiple text messages that she wanted to be a family again – and March 31, 2018, when she filed a Complaint for Divorce against the Father in Michigan.

122.     The Father alleges that I.N.D. was wrongfully retained in the United States from Canada beginning immediately before I.N.D.'s birth on December 11, 2017.

123.     The Father must show (i) that I.N.D.'s habitual residence immediately before December 11, 2018 was Canada, (ii) that the Father has custody rights to I.N.D. in Canada, and (iii) that the Father was actually exercising those rights on December 11, 2017.

124.     The Mother only challenges that the Father fails to meet his burden of proof with respect to habitual residence.

### i.  I.N.D.'S HABITUAL RESIDENCE

125.     The Court must determine where I.N.D.'s habitual residence was "immediately before" his alleged wrongful retention. Convention Art. 3.

126.     Based on the law cited above, the Court will apply the shared parental intent standard set forth in *Ahmed*.

127.     The same evidence the Court relied upon to conclude there was no consistent attitude of acquiescence over a significant period of time is used by the Court to conclude that

the Mother and Father's mutual intent for where I.N.D. would live was absent from the time the Mother remained in the United States on August 20, 2017 until I.N.D. was born on December 11, 2017. *See, supra,* ¶¶ 106-07. The parties' intent before August 20 – when the Mother was just five months pregnant – is insufficient to make I.N.D. a habitual resident of Canada, as discussed below.

128.     In recognizing that instances exist where shared parental intent is an appropriate consideration for determining a child's habitual residence, the Court in *Ahmed* contemplated shared parental intent regarding born children who had visited their alleged country of habitual residence at least once.

129.     Here, I.N.D. has only lived in the United States, and there is no evidence that he has even been to Canada to visit.

130.     The Ninth Circuit addressed a similar issue in *In re A.L.C.*, 607 Fed. Appx. 658 (9th Cir. 2015).

131.     Declining to return a newborn child under the Hague Convention, the Court held that "[w]hen a child is born under a cloud of disagreement between parents over the child's habitual residence, and a child remains of a tender age in which contacts outside the immediate home cannot practically develop into deep-rooted ties, *a child remains without a habitual residence* because 'if an attachment to a State does not exist, it should hardly be invented." *Id.* at 662 (quoting *Holder v. Holder*, 392 F.3d 1009, 1020-21 (9th Cir. 2004)) (emphasis added).

132.     This Court agrees with the Ninth Circuit's reasoning; I.N.D. had no habitual residence immediately before his birth and retention in the United States.

133.     The aim of the Convention – to "prevent a child from being taken out of the family and social environment in which its life has developed," *see Ahmed*, 867 at 687 – is not

well served if the Court orders a child removed to a country in which he has never lived, and which is not his habitual residence.

134.    The Father fails to establish I.N.D.'s habitual residence was Canada immediately before the alleged wrongful retention.

135.    The Father does not prove his prima facie case for the return of I.N.D. to Canada.

### E.  I.N.D. – ARTICLE 18 DISCRETIONARY RETURN

136.    In his petition, the Father asks the Court to exercise its equitable discretion, under Article 18 of the Convention, to return I.N.D. to Canada, "even if the Mother establishes one of the Convention's . . . exceptions to return."

137.    Under Article 18 of the Convention, if a petitioner establishes his or her prima facie case, and the respondent subsequently establishes one of the exceptions to return, the court may still exercise its plenary power "to order the return of [a] child at any time." Convention Art. 18; *Friedrich II*, 78 F.3d at 1067 ("[A] federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention.").  *See also Lozano v. Montoya Alvarez*, 134 S.Ct 1224, 1237-38 (2014) (Alito, J. concurring).

138.    The Father did not prove his prima facie case, so the Court never considered whether the Mother established a defense with respect to I.N.D.  Nevertheless, during the third day of the evidentiary hearing, the Father's counsel argued that the Court should "return" I.N.D. to Canada – so that the "family" would not be separated – regardless of the habitual residence determination, so that the family would not be separated.

139.    Because the Father failed to demonstrate that Canada was I.N.D.'s habitual residence, the Court does not have the discretion to "return" I.N.D. to Canada.  I.N.D. has never

lived in Canada; thus, the relief the Father requests essentially is that the Court order I.N.D.'s *removal* to Canada.

140.     Giving a court discretion to order the removal of a child to a country that is not, nor ever has been, his or her habitual residence is not contemplated by the Convention and would not serve the purposes of the Convention.  The Father's reliance – in his trial brief – on an excerpt from *de Silva v. Pitts*, 481 F.3d 1279 (10th Cir. 2007), implicitly acknowledges this point.  *See id.* at 1285 ("In fact, even if a defense is established, a court still has discretion to order the return of the child ***if it would further the aim of the Convention*** which is to provide for the ***return*** of a ***wrongfully removed [or retained] child***.") (emphasis added; brackets in Father's brief).

141.     The Father fails to establish that I.N.D. was wrongfully retained in the United States.

142.     The Father fails to demonstrate that the Court has discretion under Article 18 of the Convention to *return* I.N.D. to Canada.

### F.  I.N.D. – CONCLUSION

143.     The Father failed to prove his prima facie case with respect to I.N.D.

144.     Accordingly, this Court will not order I.N.D.'s return to Canada.

## V.     CONCLUSION

The Father's petition is **GRANTED IN PART** and **DENIED IN PART**.

The Court **DENIES** the Father's request to order the return of I.N.D. to Canada under the Hague Convention.

The Court **GRANTS** the Father's petition with respect to N.M.D.  In accordance with the Hague Convention and without prejudice to any further custody proceedings in any forum:

(1) N.M.D. must be returned to Canada by **October 15, 2018**;

(2) Consistent with Article 19 of the Convention, this Order is not a determination of the merits of any custody issue;

(3) No party may remove N.M.D. from the Eastern District of Michigan until he is returned to Canada.  If a party removes the child in violation of this order, the Court will issue a warrant for the arrest of the removing party and appearance for a contempt hearing;

(4) Before October 15, 2018, the Father must take the necessary steps so that N.M.D. can begin school in Canada as soon as he is returned;

(5) The parties must meet and confer before October 15, 2018 to agree on which of N.M.D.'s belongings will be returned to Canada and which will remain in Michigan.  The Mother must give the Father N.M.D.'s passport and all other formal documents necessary to enroll N.M.D. in school or to obtain health insurance or other benefits in Canada;

(6) The parties must take whatever steps they can to expeditiously proceed with divorce and/or child custody proceedings – including a preliminary child visitation determination, if possible – in the appropriate forum;

(7) Until N.M.D. is returned to Canada, the Interim Order for Contact entered by the Court on July 25, 2018, will remain in full force and effect;

(8) Before October 15, 2018, the parties must attempt to agree to a visitation schedule that applies after N.M.D. is returned to Canada until a different custody or visitation arrangement is entered in the parties' divorce and/or custody proceeding;

(9) If the parties are unable to reach any of the agreements contemplated above, they must file a Joint Statement with the Court setting forth their respective positions and areas of disagreement;

(10) Pursuant to ICARA § 9007, the Father may file a motion – on or before **September 28, 2018** – with respect to his request for "reduced fee attorneys' fees and costs incurred" as a result of the Mother's wrongful retention of N.M.D.:

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3).  The Mother may respond on or before **October 12, 2018**; and

(11) The parties must file a Notice with the Court immediately after the Mother returns N.M.D. to Canada.  Following this submission, the Court will terminate the case.

**IT IS ORDERED**.

S/Victoria A. Roberts                         
United States District Judge

Dated:  September 14, 2018